# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| DOROTHY HOPE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:13-CV-493-TLS |
| | ) | |
| ARCELORMITTAL BURNS HARBOR, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant's Renewed Motion for Summary Judgment [ECF No. 56] filed by the Defendant, ArcelorMittal Burns Harbor, LLC. For the reasons set forth below, the motion for summary judgment is **GRANTED**. The clerk is **DIRECTED** to close this case.

## BACKGROUND

On December 30, 2013, the Plaintiff, Dorothy Hope (Hope), filed her complaint [ECF No. 1] pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, et seq., as amended, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, et seq., and 42 U.S.C. § 1981 (§1981). Hope alleges that she was hired by the Defendant, ArcelorMittal Burns Harbor, LLC (AM), in 1990 as a laborer. [*Id*. at 2.] Hope claims she was removed from her training by her supervisor who "stated that he wanted younger men on the mill," which prevented any possibility of promotion, on June 19, 2012. [*Id*.] She alleges that she has been denied, and continues to be denied, opportunity for training and advancement because

of her sex, age, and race. [*Id*. at 2–4.] She also claims that she was retaliated against after she complained of the discrimination to AM and subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). [*Id*. at 4–5.] AM's Answer [ECF. No. 8] was filed on March 17, 2014.

After the close of discovery, AM filed a motion for summary judgment [ECF. No. 33] on January 8, 2016, along with a memorandum and exhibits in support [ECF. No. 34]. On April 9, 2016, Hope filed her response in opposition [ECF No. 48] along with an appendix of additional materials [ECF. No. 47]. In it, as part of her argument, Hope pointed out that many of AM's allegedly undisputed facts were not supported by AM's designated evidence. [*See* ECF No. 48, pp. 2–7.] She also disputed AM's reliance on her failure to respond to AM's requests for admissions by stating that she was contemporaneously filing a motion to withdraw those admissions. [*Id*. at 5–6.] On April 12, 2016, AM filed motions for leave to substitute and/or supplement [ECF Nos. 49 & 50] several exhibits due to administrative filing errors in order to address Hope's arguments. Hope did not respond to these motions, but, on that same day, she filed a motion to withdraw admissions [ECF No. 51] pursuant to Federal Rule of Civil Procedure 36(b). AM filed its response [ECF No. 52] to Hope's motion on April 14, 2016. Hope filed her reply in support of her motion to withdraw admissions [ECF No. 53] on April 25, 2016. On May 2, 2016, AM filed its reply in support of its motion for summary judgment [ECF No. 54].

After considering the matter as a whole, the Court denied the motion for summary judgment without prejudice and with leave to refile, denied the motions to substitute as moot, and granted the motion to withdraw admissions. [*See* ECF No. 55.] Subsequently, AM filed the instant renewed motion for summary judgment [ECF No. 56], along with a memorandum and exhibits in support [ECF No. 57] on November 17, 2016. On December 30, 2016, Hope filed a

response [ECF No. 61] and appendix of additional materials [ECF No. 60] in opposition to AM's motion for summary judgment. Finally, on January 24, 2017, AM filed its reply in support of its motion [ECF No. 62]. The motion is thus ripe for adjudication.

## DISCUSSION

### A. Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. In determining whether summary judgment is appropriate, the court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citation omitted).

While the movant bears the initial burden of production to inform the district court why a trial is not necessary, these requirements "are not onerous" where the nonmovant "bears the ultimate burden of persuasion on a particular issue." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" or by "asserting that the

nonmoving party's evidence [is] insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 1169 (citation and internal quotations omitted). A party opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading, but rather, must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The nonmovant must inform the court of both the factual and legal reasons why summary judgment should not be entered. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). Courts are limited to the arguments presented in the parties' briefs; "[a]fter all, a lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id*. (internal quotation marks, citations, and ellipsis omitted).

With regard to the assessment of the evidence that is presented, the Seventh Circuit has stated:

> Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment). *See also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay is not enough to preclude summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial); *Bombard*, 92 F.3d at 562 (inadmissible hearsay from an affidavit or deposition will not suffice to overcome a motion for summary judgment).

*Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Ultimately, if the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

## B. Material Facts

The following facts are taken from the parties' briefs and relevant evidentiary submissions; they are undisputed unless otherwise noted. At the time she filed her complaint, Hope, an African-American woman, was fifty-four years old. [ECF No. 1, p. 2; ECF No. 57-3, p. 16.] Hope began working in the steel industry in the late 1970s and began working for AM's predecessor companies during the 1990s, eventually making her way to the Tandem Mill, a component of AM's Finishing Division. [ECF No. 57-1, pp. 14, 22–23, 27–31; ECF No. 53-1, p. 2.] The Tandem Mill employees are part of the United Steelworkers of America and are covered by a collective bargaining agreement (the CBA). [ECF No. 57-7.]

Within AM's Finishing Division, there are five salaried job positions: Utility Person (Labor Grade 1), Service Technician (Labor Grade 2), Operating Technician (Labor Grade 3), Maintenance Technician (Labor Grade 4),[1] and Senior Operating Technician (Labor Grade 5). [ECF No. 57-6, pp. 9–10; ECF No. 57-9.] The CBA dictates the rate of pay for each Labor Grade, and employees earn a higher rate of pay with each Labor Grade they move up. [ECF No. 57-1, pp. 34–36, 58–61.] Movement from one Labor Grade to another is determined by: (1) ability to perform the work and physical fitness; and (2) Plant Continuous Service, which is related to seniority.[2] [ECF No. 57-7, p. 9.] An employee is not qualified to move to a higher

---

[1] Maintenance Technician (Labor Grade 4) is separate from the other Grades in the Finishing Division's line of progression—the other assignments move directly from the top assignment in Grade 3 to the lowest assignment in Grade 5. [ECF No. 57-6, p. 10; ECF No. 57-9.]

[2] Hope objects to AM's reliance on Exhibit 3—which it claims is part of the CBA produced by Hope—because "it does not appear to be a part of the December 22, 2012, [CBA] and was not produced to [Hope] as 0071." [ECF No. 61, p. 7.] However, as pointed out by AM in its reply brief, the motion for summary judgment asserted that the document was produced *by* Hope not *to* Hope, and Hope has presented no evidence to the contrary. Moreover, she authenticated it during her deposition as an excerpt from the CBA. [ECF No. 57-1, pp. 71–72.] Thus, her objection is unfounded.

Labor Grade based on seniority alone; rather, an employee must successfully master each of the roles within a Labor Grade position before the employee is eligible for a promotion to a higher Labor Grade. [ECF No. 57-1, pp. 75–77; ECF No. 53-1, p. 3.] Seniority is not a function of age but rather how long the employee has been working at AM. [ECF No. 57-3, p. 21; ECF No. 57-6, pp. 32–33.]

Hope began working in AM's Finishing Division in a Labor Grade 2 position, and she moved up to a Labor Grade 3 Operating Technician position by the early 2000s. [ECF No. 57-1, pp. 29–34, 45–46; ECF No. 53-1, p. 2; ECF No. 57-9.] As of the date of the filing of the instant motion, Hope was still employed in a Labor Grade 3 position.[3] [ECF No. 53-1, p. 2.] Within Hope's Labor Grade 3 Operating Technician position's line of progression, there are several assignments that an employee must learn, in order from easiest to most difficult, including Process Helper (PO), Feeder, Auxiliary 2 (Aux 2), and Auxiliary 1 (Aux 1). [ECF No. 57-1, pp. 42–46, 60–61; *see also* ECF No. 57-9.] The next assignment after Aux 1 is Assistant Roller (Asst Roller) followed by Roller, both of which are Labor Grade 5 Senior Operating Technician positions. [ECF No. 57-9.] Employees with seniority are given the first opportunity to train for new assignments. [ECF No. 57-1, pp. 72–74.] An employee is trained to perform the essential functions of an assignment, and once an employee masters those functions they are considered qualified for that assignment. [ECF No. 57-1, p. 62.] If an employee cannot master the essential functions of an assignment after training, he or she may not move to the next assignment. [ECF

---

[3] The document cited by AM to support this fact is "Plaintiff's Responses to Defendant's Requests to Admit" [ECF No. 53-1], which was served on April 14, 2016. In her response brief, Hope does not dispute that she was still employed by AM in that capacity as of the date of the filing of the motion on November 17, 2016, or her response brief on December 30, 2016.

No. 57-1, pp. 75–78.] Moreover, if an employee cannot perform the essential functions of an assignment, he or she is disqualified from it. [ECF No. 57-6, p. 29.]

As a Labor Grade 3 Operating Technician, Hope first served as a PO and then became a Feeder in approximately 2005, where she served for many years. [ECF No. 57-1, pp. 33–34, 46, 87.] However, as of the date of her deposition on May 5, 2015, Hope was serving in the PO assignment and does not dispute that she was still serving in that position as of the date of the filing of the instant motion and her response brief.[4] [ECF No. 57-4, p. 80.]

From September 2007 to May 2012, John King (King) was the Operation Manager of the Tandem Mill. [ECF No. 57-10, p. 10.] In the spring of 2012, Jim Velto (Velto) took over for King as Operation Manager. [ECF No. 57-6, pp. 9, 42.] The Operation Manager and Process Manager determine who trains for particular assignments. [ECF No. 57-6, p. 10.] An employee who is training for a new assignment is assigned a veteran employee who typically supervises that trainee for the duration of the training. [ECF No. 57-6, p. 10.] However, throughout the process, the Operation and Process Managers continue to observe the trainee and solicit feedback from the veteran employee as to whether the trainee is qualified or progressing at the appropriate rate. [ECF No. 57-6, pp. 10–11.] AM has the ability to track productivity and diminished production, and it maintains expectations for the time it generally takes an employee to qualify on each assignment.[5] [ECF No. 57-11, pp. 5–6.]

---

[4] Hope's response brief was filed on December 30, 2016. [ECF No. 61.]

[5] Hope argues that AM only has the ability to track production by the whole Tandem Mill and not by specific crew. [ECF No. 61, p. 2.] She states that AM "cannot attribute delays to any specific crew, let alone any specific employee, without going back and researching every delay." [ECF No. 61, p. 2.] However, in the deposition testimony that she cites to support her argument, Velto testified that the figures for the particular exhibit being asked about (Exhibit 13) were by mill. [ECF No. 57-6, p. 27.] He then went on to state that the figures he had been asked about earlier in the deposition (pertaining to Exhibit 12) were "by crew." [ECF No. 57-6, pp. 25–27.] He further testified that, while not all of the delays related to Exhibit 13 could be directly attributed to Hope, "[t]he gap time, I believe, most definitely

The Aux 2 and Aux 1 assignments require an employee to operate a set of controls to shape the coil to the customer's specifications. [ECF No. 57-4, pp. 25–28.] The Aux 2 assignment involves steering the strip of steel straight as it goes through the mill; then the Aux 1 assignment takes over, making sure that the strip is straight and is fed to the next part of the process. [ECF No. 57-10, p. 24.] A document entitled "Time Limits for Training" sets forth limits based on "the training programs at integrated steel mills with similar operations." [ECF No. 57-11, p. 5; ECF No. 57-12.] It lists the training period for the Aux 2 and Aux 1 assignments as eight weeks each. [ECF No. 57-12.] As pointed out by Hope, this document was published by Velto on June 12, 2012. [ECF No. 57-11, p. 5; ECF No. 57-12.] Prior to that date, King testified that there "wasn't a set time" for an employee to complete the training, but that AM had a "time that we thought" it would take. [ECF No. 57-10, p. 19.] Hope trained on the Aux 2 assignment from November 7, 2011, through January 7, 2012, for approximately nine weeks, and she trained on the Aux 1 assignment from January 22, 2012, through April 4, 2012, for about 10 weeks. [ECF No. 57-11, p. 5.] AM contends that both training periods were longer than typical, and Hope responds by pointing out that the official standards were not instituted until after her training periods had ended. Regardless of the official standards set forth by Velto in the "Time Limits for Training" document, King testified that he "actually gave [Hope] more training time than I have anybody on a job," and Hope unequivocally admitted in her responses to AM's requests to admit that she received "extra training" on the Aux 2 and Aux 1 assignments. [ECF No. 53-1, p. 1; ECF No. 57-10, p. 43.]

---

was contributed on that crew, considering there's four crews. [Hope] contributed to the increase in gap time during that period." [ECF No. 57-6, p. 27.] Based on this testimony, AM does have the ability to track production by crew, but not with regard to the figures contained in Exhibit 13.

Related to that training, King affirmed that the progression generally moves from Aux 2 to Aux 1; as to Hope's movement between the two Auxiliary assignments he testified:

> In my mind, you have to be qualified in both of them to be actually qualified to do an auxiliary job. There's the second aux, and then there's the first aux. We started [Hope] on the second aux, and she took a while. We—she did work the job at times. I thought if she learned some of the first aux, it would help her on the second aux job. And it didn't seem to be progressing the way I wanted it to. . . . [As to the progression], I didn't personally break them down. I thought—my philosophy was you have to know both auxiliary positions to be qualified at the aux job. . . . I'm not going to say that she became qualified as an auxiliary, because I looked at the auxiliaries as one position, but in two stages to that one position. Could she—did she work that job? Yeah. Did she need some help? Yeah. . . . But she never got to the first auxiliary at least when I was there. We would start it—because in my mind I thought, well, if she understood a little bit more about some of the first auxiliary, it would help her with what she was doing on the second auxiliary. That's why— and not just for Ms. Hope, for anybody, that job, you weren't really qualified until you could do both jobs. Now, after I left, I don't know how they did it.

[ECF No. 57-10, pp. 23–24, 38–39.] Hope and Velto each testified that Hope had technically been considered qualified in the Aux 2 assignment at some point prior to Velto becoming Operation Manager. [ECF No. 57-2, p. 18; ECF No. 57-6, p. 13.] In any event, Hope was removed from the Aux 1 training assignment because, according to King, she "didn't seem to be picking it up real well," and he was unsure if Hope had the capability to do so despite being assigned an additional hourly trainer, Ron Crosslin (Crosslin), to help teach her the functions of the job. [ECF No. 57-10, p. 21–23.] Specifically, King testified that Hope was unable to competently perform several required tasks such as leveling the mill, inspecting the top side of the strip for defects, and consistently making the strip shape as flat as possible. [ECF No. 57-10, p. 53; ECF No. 57-13, p. 2.] Although King testified that Hope could do the work "at times," he went on to state that it needed "[l]ots more work" overall and that he had already given Hope "above and beyond what I thought—more than anybody." [ECF No. 57-10, p. 53.] In addition, King testified that Hope had "incidents"—one of which was documented—with employees who

were working with or training her. [ECF No. 57-10, pp. 20–21, 40–45, 49–51.] During his deposition, King also indicated that several managers, including Mark Wray (Wray), John Cowger (Cowger), and Jay Gustafson (Gustafson), had told him they believed that Hope was responsible for a drop in production.[6] [ECF No. 57-10, pp. 35–37.] Hope testified that King told her the removal from Aux 1 was because younger, male, and/or Caucasian members of the Auxiliary crew had blamed her for the low production; however, she claims that when confronted as a group with both King and Hope present, the crew—including Russell E. Harris (Harris or Bubba),[7] Anthony Aster (Aster),[8] and David Harmon (Harmon)—informed King the real reason for the low production was because AM had taken away their incentive pay. [ECF No. 57-2, pp. 18–21.] That said, Hope confirmed that, at least as of November 19, 2014—the date of her first deposition—the incentive pay structure had not reverted back to its original numbers and employees were still "de-incentivized." [ECF No. 57-4, pp. 14–15.] Hope also testified that, in her opinion, the crew members did not want her to qualify for Aux 1 because her next assignment would be that of Assistant Roller, a Labor Grade 5 position; she points out that Harris, Aster, and Harmon have now all qualified ahead of her.[9] [ECF No. 57-2, p. 18; ECF No. 57-9; ECF No. 47-3, pp. 1–2; ECF No. 60-1, p. 1.]

---

[6] Hope argues that this testimony is inadmissible hearsay. The Court agrees with AM that it is allowable for the limited purpose of showing the effect it had on King—in other words, it is not being offered and considered for the truth of the matter asserted but rather for what King proceeded to do with that information. *See Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 924–25 (7th Cir. 2015) (employees' out-of-court statements were not offered to prove the truth of the incident that had occurred but instead were properly admitted as evidence of one of the many reasons the defendant relied on when making its decision to fire the plaintiff).

[7] [*See* ECF No. 57-10, p. 35.]

[8] In Hope's response brief, she repeatedly refers to him as Aster, so the Court will follow suit; however, in her answers to AM's interrogatories, he is listed as Ajster. [*See* ECF No. 47-4, p. 2.]

[9] Harris qualified as a Roller, Harmon as an Assistant Roller, and Aster as Aux 1. [ECF No. 47-3, pp. 1–2; ECF No. 60-1, p. 1.]

According to Hope, hundreds of tons of steel were rejected while the following individuals were at the Aux 1 assignment—costing AM over $700,000—yet they were not disqualified: Harmon, Brian Richa (Richa), Berris Samuels (Samuels), and Michael Silhavy (Silhavy). [ECF No. 47-3, pp. 1–2, 8.] In support of this contention, she points to a partially obscured, undated, unsigned document allegedly distributed by Velto that attributes the rejection to "steel on the rolls" which is commonly caused by a "damaged tail going through the mill with roll force on that mill." [ECF No. 47-3, p. 8.] The Quality Assurance department was asked to make a list of dates and times the coils were produced, but it is not clear from the document what the result of that inquiry was. [ECF No. 47-3, p. 8.] In addition, Hope attests that "turn operation reports" show gap times listed as "delays," damage to the tail, and pinched tails. [ECF No. 60-1, p. 1.] The referenced reports—which appear to contain hand-written explanatory notations—are from three days in November 2016 and do not mention Hope or any of the employees listed above; in fact, the only positions noted are those of Foreman, Roller, and Recorder.[10] [ECF No. 60-1, pp. 3–6.]

Hope was scheduled to begin an Aux 2 assignment again on April 12, 2012; prior to that date though, she filed a grievance and, as part of a settlement, was ultimately reassigned to Aux 1 training in May of 2012. [ECF No. 57-11, p. 5; ECF No. 57-2, p. 32–33; ECF No. 57-10, pp. 24–25.] However, King left his position as Operation Manager before Hope could resume Aux 1 training. [ECF No. 57-10, p. 25.]

---

[10] As correctly noted by AM in its response brief, Hope does not provide any foundation for the "turn operation reports" including the source from which they were obtained, whether they were created in the usual course of business, and/or what their original purpose was. Hope does not attest that she has personal knowledge of any of these facts.

When Velto began as Operation Manager, he was tasked with improving the quality, safety, and performance of the Tandem Mill, and he was asked by AM to recommend any necessary changes. [ECF No. 57-6, p. 28.] Velto testified that he had watched Hope at the Aux 2 assignment for several weeks,[11] and he had determined that she was "very unsure of how to improve the shape or steer the strip," that she ignored his suggestions for improvement and responded with profanity, and that he found her to be a lazy, argumentative, and incompetent worker. [ECF No. 57-6, pp. 12–13, 21, 28–29.] He further testified that several other employees assigned to Auxiliary positions "were very open to [his] input on how to improve their performance, and they got progressively better by . . . working together." [ECF No. 57-6, p. 28.] According to Velto, he observed that Hope's deficiencies negatively affected productivity. [ECF No. 57-2, p. 24; ECF No. 57-6, pp. 12–13.]

With regard to her own evaluation of her performance, Hope admitted that she was observed doing what she considered "little things" incorrectly, but she insisted that it was because several of her trainers—Harmon, Aster, and Harris—had shown her the wrong way to perform those tasks.[12] [ECF No. 57-2, pp. 26-29.] Hope contends that other African-American employees were not adequately trained either. In support of her argument, she points to Samuels who attests that when he trained for the Aux 2 and Aux 1 assignments, his Caucasian trainer did not provide him with adequate training; instead he had to rely on a fellow veteran to show him how to slow the mill down to avoid wrecks. [ECF No. 60-2, pp. 1–2.] Despite his allegedly

---

[11] Hope testified, however, that Velto only watched her for three days before she was disqualified as Aux 2. [ECF No. 57-4, pp. 11-13.] It is undisputed that Velto observed her at some point while she was at the Aux 2 assignment. In addition, Hope testified that Crosslin also watched her at that assignment. [ECF No. 57-2, p. 24.)

[12] Of note, Hope did not testify that Crosslin trained her improperly.

improper training, the materials Hope submitted with her affidavit show that Samuels not only qualified at Aux 2 and Aux 1 but that he also advanced beyond those assignments to become qualified for Asst Roller.[13] [ECF No. 47-3, pp. 1–2, 4–5.] In addition, Hope submits the affidavit of William Brooks (Brooks), an employee at AM since 2001; in it, Brooks attests that he observed Hope during her training on the Auxiliary assignments "without any training personnel present" and that she "performed the Auxiliary position without supervision." [ECF No. 60-3.] Brooks does not provide any information as to the days and times he observed Hope, nor does he attest that he was present during the entirety of her various training periods. Moreover, Brooks' affidavit contradicts Hope's own sworn testimony wherein she stated that she *was* trained by various individuals—albeit allegedly incorrectly—and was observed by Velto and Crosslin while on the Aux 2 assignment. [*See* ECF No. 57-2, pp. 24–29.]

Statistically speaking, computers attached to the machines Hope works/worked on track and record production metrics, including average gap times between coils. [ECF No. 57-4, pp. 11–13.] When asked about the negative results of production mistakes, including those that would cause mill shut-downs, Hope testified as follows:

---

[13] Samuels also attests that "[u]p to 2013, all employees disqualified by James Velto were African Americans." [ECF No. 60-2, p. 1.] However, the Court agrees with AM that Samuels has provided no foundation for this evidence, does not attest that it is based on his personal knowledge, and does not identify which African-American employees were allegedly disqualified by Velto. *See Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) ("We have made clear that the evidence supporting a factual assertion must represent *admissible* evidence. Conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment.") (internal citations, quotation marks, and brackets omitted). Similarly, Samuels attests that "Caucasian feeders were motivated to cause such a shut down so that I would not qualify and they could qualify ahead of me." [ECF No. 60-2, p. 1.] Not only is this statement speculative, but it also does not indicate that the alleged motivation was *because of* race or any other prohibited reason. *See Gabrielle M. v. Park Forest–Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir.2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations.") (emphasis in original). Finally, Samuels attests that an unnamed Caucasian Roller "told me that there was little he could do when he saw a mill wreck coming, as he did not want to be perceived as looking out for me, an African-American." The Court agrees with AM that this is inadmissible hearsay. *See Bordelon*, 811 F.3d at 989.

Q: When those kinds of things would happen, I'm sure—it sounds like there would be a negative result of that?
A: You know, you stopping the mill. The mill ain't running, you ain't producing. You're down.
Q: So the mill's down, right?
A: Right.
Q: Then it takes time to get it back going?
A: Oh, yes.
Q: So then that's—that's a loss of production time, right?
A: Right. Right.
Q: And then in the end it means it takes that much longer—
A: Right.
Q: —to get all these orders filled, right?
A: Right.
Q: And does that consequently loss of time equate to a loss of money too?
A: Yes, because you not getting the right amount of tons that the mill expect you to get.
Q: So it sounds like there's a quota you try to reach every day on tons rolled through the mill?
A: Right.
Q: Which translates then to dollars?
A: Right, for the mill.
Q: So the more and the quicker you can run these coils through, that's a higher productivity, right?
A: Right.
Q: It means higher profits—
A: Right.
Q: —because you get those orders out, and they're purchased by those customers?
A: Right.

[ECF No. 57-1, pp. 82–84.]

According to AM, Hope's performance problems caused documented production delays, resulting in losses; specifically, with Hope working in the Aux 2 and Aux 1 assignments from April 12, 2012, through June 20, 2012, AM calculated the following with regard to production:

- Average tons produced decreased from 168,812 to 137,462.
- Average tons increased to 162,051 after June 20, 2012.
- Average tons per hour decreased from 261.98 to 253.84.
- Average tons per hour increased to 291.42 after June 20, 2012.
- Total % Average Delay increase from 28.50 to 35.91.
- Total % Average Delay dropped to 29.88 after June 20, 2012.
- Average gap times (time between coils) increased from 83.7 to 88.9 seconds.
- Average gap times (time between coils) dropped to 82.0 after June 20, 2012.

[ECF No. 57-6, pp. 27–28; ECF No. 57-11, pp. 5–6.] Velto testified that, while not all such delays and decreased production statistics were due to Hope, he believed that a "significant portion" of the "increase in gap time during that period" was attributable to her. [ECF No. 57-6, p. 27.] Hope does not directly refute the accuracy of the figures above, but she does point out that they were calculated by the whole Tandem Mill, as opposed to by specific crew, without reference to the exact dates she worked, and she accurately asserts that Velto testified the delays other than the gap time were difficult to assign specifically to Hope without "going back and researching every delay."[14] [ECF No. 57-6, p. 27.]

Regardless, it is undisputed that Velto decided to disqualify Hope from the Aux 2 assignment in June 2012. [ECF No. 57-6, pp. 12–13; ECF No. 57-11, pp. 5–6.] Per Velto, he did so based on his own industry experience, his personal observations of Hope's performance on the Auxiliary, and his second-hand knowledge of her previous history of training. [ECF No. 57-6, pp. 12–13, 29–30, 34.] In Velto's estimation, Hope was unable to perform the functions of the Aux 2 assignment. [ECF No. 57-6, pp. 27–29.] Thus, Hope was re-assigned back to the Feeder assignment. [ECF No. 57-1, p. 87; ECF No. 57-4, pp. 18–19.] Velto informed Hope of his decision on June 19, 2012, at a meeting that also included Wray, the process engineer at the Tandem Mill, and Harris, a member of the Union Grievance Committee. [ECF No. 57-14; ECF No. 57-15.] Hope filed an internal Civil and Human Rights Complaint on November 1, 2012, with the Union following her removal from the Auxiliary;[15] the Complaint states that, during the

---

[14] Although not entirely clear from the parties' briefs, the Court assumes that the figures referenced in this paragraph are related to what was marked Exhibit 13 in Velto's deposition; as noted in footnote five above, it is true that Velto testified Exhibit 13 represents figures "by mill." [ECF No. 57-6, pp. 26–27.]

[15] Velto testified that the internal Complaint did not result in a finding of race, sex, or age discrimination. [ECF No. 57-6, pp. 31–32.] Hope argues that this statement is inadmissible hearsay based only on what he "was told." AM replies by arguing that Velto's testimony was based on his own personal knowledge of

June 19th meeting, Velto told her she was struggling with the Aux 2 assignment, that he wanted some "young mens" (sic) to be able to train on this side of the mill, and that he would find her another assignment within the same paygrade. [ECF No. 57-14.] Harris attests that Velto also told Hope that the delay times had increased when she was at the job. [ECF No. 57-15, p. 4.] Hope testified that when she questioned him regarding the disqualification, Velto said, "No, it's nothing against you. It's just that, you know, we need younger mens on the mill." [ECF No. 57-2, p. 25, 27.] When pressed further about Velto's statement, Hope testified as follows:

> Q:  Mm-hmm. That's when he—that's when Velto, in this document that you read after you—after you read it and signed it, it said Velto wanted younger men on the side of the mill, right?
> A:  Right.
> Q:  And didn't he just mean guys with less seniority?
> A:  No.
> Q:  How do you know that?
> A:  Because he said younger men. And then when I told him, Excuse me, what you say? He say, You know, younger men, with that zing. Does that mean seniority to you?
> Q:  So today you're remembering he said something about with that zing?
> A:  Yes, right.
> Q:  Do you see any reference to him saying with that zing anywhere in here?
> A:  No because I didn't write it down, but I know it happened.
> Q:  But you never mentioned that Mr. Velto, in addition to saying, these younger men, kind of hit his hand to his fist and said with that zing?
> A:  With that zing.
> Q:  What did that mean to you?
> A:  He did that a second time. It mean to me, like, energy, what—younger, you know. That's what that would mean to me.
>                                  . . .
> A:  Just because I didn't put that zing in there that don't mean he didn't do it. He did it. And is—that's why I know that he discriminated against me.
> Q:  Why?
> A:  Because he did that, that younger, you know, with that zing, you know, with that muscles. Hey, I got it too. I challenge any man. You jump in the hole, I'll jump in there right behind you.

---

the outcome of the Complaint that included specific allegations against him. Either way, Hope does not present any evidence that the internal Civil Rights Committee found discrimination of any form to be an issue with regard to her removal from the Auxiliary.

[ECF No. 57-2, pp. 60-63.] Velto insists that he referred to "younger guys" in that conversation as opposed to "younger mens." [ECF No. 57-6, pp. 32–33.] He testified that he routinely uses the word "guys" to refer to people in general, and he used the word "younger" in that context to refer to employees with less workplace seniority than Hope. [ECF No. 57-6, pp. 19, 32–33.] Harris attests that he does not believe Velto made a derogatory comment to Hope during the meeting; rather, in his opinion, the reference to "younger guys" meant "people whom, based on seniority, were next in line to train in the job class 3 block." [ECF No. 57-15, pp. 2–4.] It is undisputed that the employees on the Tandem Mill with less seniority than Hope were all male at that time. [ECF No. 57-2, p. 62.] Samuels attests that he heard Velto state he wanted young males on the mill, but he does not indicate when this comment was made or in what context it occurred. [ECF No. 60-2, p. 1.]

Subsequent to Hope's disqualification from the Aux 2 assignment, the employees next in line in terms of seniority trained on those assignments and, according to Velto, excelled at them after completing only the standard training period. [ECF No. 57-6, p. 33.] Hope filed a Charge of Discrimination with the EEOC related to her Auxiliary disqualification several months after she filed her internal Complaint, and she testified that around the time she subsequently received the Dismissal and Notice of Rights to sue letter from the EEOC on September 27, 2013, Harris began allowing his "buddies"—all white males with less seniority than her—to proceed straight from Aux 2 assignments to train on Asst Roller assignments, skipping the Aux 1 assignment in violation of the line of progression.[16] [ECF No. 57-2, pp. 2–14; ECF No. 57-17; *see also* ECF No. 47-3, pp. 1–7; ECF No. 60-1.] Hope identified those employees during her deposition as Joe

---

[16] Hope's response brief states that these employees were allowed to advance from Labor Grade 2 positions to Labor Grade 5 positions, but this assertion mischaracterizes Hope's testimony, and there is no other evidence provided that would support it.

Mercer (Mercer),[17] Joe Carrasco (Carrasco), Larry Auskel (Auskel), Richard O'Halleck

(O'Halleck), Chris Zolkowski (Zolkowski), Harmon, and Silhavy. [ECF No. 57-2, pp. 15–17.]

When asked to describe why Harris allowed these employees to skip over the Aux 1 assignment,

she testified as follows:

> A: I feel that he—he moved them up to train improperly just because, you know,
> they his buddies and—
> Q: And helped him?
> A: And voted for him, helped him get voted in. And I—and I didn't vote for him,
> and he had to repay them a favor.
> Q: And he doesn't (sic) you because you didn't vote for him?
> A: No.
>                                    . . .
> Q: Dorothy, I just wanted to ask you a quick question. I think you referenced earlier
> that [Harris] started promoting these guys with less seniority because you didn't
> vote for him and they did, is that true?
> A: Yeah, but that's not, you know—that's not the reason why. It's because those
> his group of friends. You understand?

[ECF No. 57-2, 9–11.] Hope went on to testify that she believed Harris moved the men up ahead

of her because she refused to "suck up" to him and had hurt his pride. [ECF No. 57-2, p. 14.]

Later in the deposition, Hope reiterated that Harris did not like her because she had not voted for

him and was not part of his "clique" and that those employees who were "buddies" with Harris

and had voted for him received the opportunity to train on the Asst Roller assignment. [ECF No.

57-2, p. 68, 76–77.] When asked to confirm that Silhavy, Auskel, O'Halleck, and a number of

other employees were treated more favorably in terms of conditions and privileges of

employment because they were well-liked and had the "right" to train as opposed to because they

were younger, male, Caucasian employees, Hope responded in the affirmative. [ECF No. 57-2,

pp. 83–86.]

---

[17] Hope does not identify Mercer or Harmon as one of these individuals in her response brief.

Overall, Hope attests by way of affidavit that AM promoted sixteen (16)[18] less-senior, younger, Caucasian males to positions higher than Feeder following her removal from the Auxiliary and that many of those employees eventually became qualified for the Labor Grade 5 positions of Asst Roller or Roller. [ECF No. 47-3, pp. 1–3; ECF No. 60-1, p. 1–2.] In support of this contention, Hope relies on an email from AM's recorder setting forth the employees' ages and "rosters" showing which assignments the employees had been qualified for as of December 2016.[19] [ECF No. 47-3, pp. 4–7; ECF No. 60-1, pp. 1–2, 7–8.] Hope does not dispute that other AM employees were disqualified from assignments when it was determined that they could not and/or did not perform tasks correctly; specifically, AM points to John Riffle (Riffle), a non-African-American male employee who was given extra training but was disqualified from Feeder by Velto when his performance was not up to par. [ECF No. 57-1, pp. 81–82; ECF No. 57-6, pp. 11–12, 30.]

During her time as Feeder following her removal from the Auxiliary assignments, Hope received several written Warning and Disciplinary Reports. [ECF No. 57-18.] An April 2014 Report described a coil "mix" incident in which Hope accepted three wrong coils on entry that resulted in a sixty-nine minute mill shut down. [ECF No. 57-18, p. 2.] A May 2014 Report described a similar coil "mix" incident created by Hope that caused a forty-four minute mill shut

---

[18] Hope's response brief contains a typographical error in that it states there were "sixteen (17) younger Caucasian males less senior" than her who were promoted. [ECF No. 61, p. 10.] Hope's initial affidavit lists seventeen (17) individuals; however, it is undisputed that one of those employees, Samuels, was not Caucasian but was African-American. [ECF No. 47-3, pp. 1–2; ECF No. 60-2, p. 2.] Hope's later affidavit adds four (4) new individuals to her total list. [ECF No. 60-1, pp. 1–2.]

[19] AM argues that the rosters are unauthenticated and that Hope has not shown—via affidavit or otherwise—that she has personal knowledge of the other workers' employment details. In addition, to the extent that Hope claims the rosters show which employees had been promoted ahead of her, they do not do so on their face. Rather, the rosters simply lists the names, IDs, hire dates, and positions the employees had qualified for as of December 2016. It says nothing about what dates the relevant employees qualified for each of the particular assignments in relation to Hope's disqualification.

down. [ECF No. 57-18, p. 4.] A July 2014 Report described an incident in May and three incidents in July, all of which resulted in mill down time. [ECF No. 57-18, p. 3.]

In early December 2014, Hope was disqualified from the Feeder assignment and returned to the PO assignment. [ECF No. 57-19.] According to Velto, the disqualification was not based on the "mix" incidents; rather, he testified that Hope was disqualified because she also caused two mill "wrecks" by improperly feeding the coils under the camera of the machine. [ECF No. 57-6, pp. 34–36.] Velto testified that mill wrecks were "extremely dangerous" to employees and that the rolls involved basically became scrap metal. [ECF No. 57-6, p. 37.] Both of the mill wrecks were captured on video—one on October 14, 2014, and the other on November 20, 2014—and Velto reviewed those videos with labor relations and human resources when making the determination to disqualify her. [ECF No. 57-6, pp. 25, 35; ECF No. 57-20.] Hope acknowledged that two mill wrecks in late 2014 occurred "on [her] crew" while she was Feeder, but she only specifically remembers one of the wrecks. [ECF No. 57-4, pp. 72–73.]

A document allegedly signed by Velto entitled "Spalled Rolls at the Tandem Mill" that was distributed to the mill workers in November 2014 indicates that some of the other mill wrecks were caused by "overpickled" coils, and the Rollers were instructed to slow the mill down to help prevent wrecks. [ECF No. 47-3, p. 9–10.] The document states that the slow down would "not prevent spalled rolls entirely. Rolls spall when previous damage is not found and removed in the grinder and when put into the mill begin to heat up through the cold rolling process." [ECF No. 47-3, p. 10.] In her affidavit, Hope points to this document and attests that "[t]he mill wreck that Velto blamed me for was not my fault, but due to the condition of the product prior to it coming into the mill and/or rollers failing to slow the mill down for over-pickled coils." [ECF No. 47-3, p. 2.] However, none of the wrecks mentioned in the document

match the dates of the wrecked mills captured on video referenced above, and Velto specifically testified that, after investigation, it was determined that a wreck involving an overpickled coil did not involve Hope. [ECF No. 47-3, p. 9; ECF No. 57-6, pp. 22–25.]

Hope grieved her disqualification from the Feeder assignment and, as a result, was given approximately three weeks of additional training. [ECF No. 57-4, pp. 75–76; ECF No. 57-6, p. 35.] However, according to Velto, Hope was still unable to perform the assignment's essential functions, and her performance was below that of other Feeders. [ECF No. 57-6, p. 36.] Specifically, Velto testified that he observed Hope feeding the head end in crookedly, which caused a delay on the mill, and that she struggled with wide, light gauge. [ECF No. 57-6, p. 25.] Velto also obtained computerized data from Erik Ahrendt (Ahrendt), the process automation engineer, showing that Hope's gap times were longer than those of other employees with less time overall on the Feeder assignment. [ECF No. 57-6, pp. 25–27; ECF No. 57-21.] After the additional training period ended, Velto made the decision on March 26, 2015, to let the December 2014 disqualification stand. [ECF No. 57-6, pp. 35-36; ECF No. 57-21.]

Since that time to and through the date she filed her response brief on December 30, 2016, Hope has remained in the PO assignment which, like the Feeder assignment, is a Labor Grade 3 position. [ECF No. 57-4, p. 80; ECF No. 57-6, p. 39; ECF No. ECF No. 57-19.] Hope testified that this change was not a "demotion" but rather a lateral move. [ECF No. 57-3, p. 62.]

In general, Hope testified that while Velto never said anything directly to her that would have led her to believe he treated her differently because of the color of her skin, she felt she was discriminated against due to Velto's actions of "picking on the blacks." [ECF No. 57-3, pp. 8–21.] She testified that she just felt "he don't like blacks." [ECF No. 57-3, p. 9.] During her deposition, the following exchange took place:

Q: Okay. And it's because of that that you're claiming he treated [the other African-American employees] differently because of the color of their skin, you're presuming then he treated you differently because of the color of your skin, right?
A: I presuming he treated me different because I'm a woman, and I'm a strong woman that will speak up. And he—and they get intimidated by that.
Q: And not because of the color of your skin?
A: Yes.

[ECF No. 57-3, pp. 21–22.] When asked specifically about her disqualification from the Feeder assignment, the following exchange took place:

A: I was disqualified while I was off work.
Q: And how is that related to your case?
A: I was disqualified feeder.
Q: And are you claiming that was—that you're being discriminated against, or are you—and/or that it was an act of retaliation as part—as part of your lawsuit?
A: It just seemed like it just happened.
Q: Okay. Are you claiming that it was in retaliation for you filing a lawsuit or for filing an EEOC charge?
A: No.
Q: Are you claiming it was because you're black?
A: No.
. . .
Q: Okay. And just to clarify, Mr. Velto disqualifying you, you don't think it was related to because you were a woman, do you?
A: No.
Q: Or age or race, right?
A: No.

[ECF No. 57-4, pp. 71, 79.] However, when asked later by her own attorney at the end of the deposition whether she believed she was disqualified from the Feeder assignment because of her race, gender, age, and in retaliation for complaining of discrimination, she answered in the affirmative. [ECF No. 57-5, pp. 84–86.]

## C. Race, Sex, and/or Age Discrimination

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "To succeed

on a Title VII claim, the plaintiff-employee must prove three elements:

> [1] he is a member of a class protected by the statute, [2] that he has been the subject
> of some form of adverse employment action (or that he has been subjected to a
> hostile work environment), and [3] that the employer took this adverse action on
> account of the plaintiff's membership in the protected class.

*Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Morgan v. SVT, LLC*, 724 F.3d

990, 995 (7th Cir. 2013)). Generally, claims of discrimination brought pursuant to § 1981 are

analyzed in the same manner as those under Title VII. *See, e.g.*, *Egonmwan v. Cook Cty.*

*Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010); *Humphries v. CBOCS W., Inc.*, 474 F.3d

387, 403 (7th Cir. 2007). As to age discrimination, the ADEA makes it unlawful for an employer

to take adverse action against an employee who is forty years or older "because of such

individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). Age must be "the 'reason' that the employer

decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Therefore, "a plaintiff

bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of

the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id.*

at 180. In this sense, the ADEA is somewhat narrower than Title VII. *Carson v. Lake Cty. Ind.*,

865 F.3d 526, 532 (7th Cir. 2017).

Discrimination claims may be reviewed on summary judgment under the direct or the

burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d

216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an

intentional discrimination claim by relying on the burden-shifting framework created by

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those

terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir.

2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced). When

the plaintiff does not present her argument in opposition to summary judgment in those terms, the direct method of proof is the "default rule." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan*, 724 F.3d at 997). Under that method, the test for whether a claim of intentional discrimination should proceed to a jury is whether the admissible evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race, sex, or age caused the adverse action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (setting out the standard for avoiding summary judgment on discrimination claim under the direct method of proof). In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Here, Hope has not invoked the *McDonnell Douglas* burden-shifting method to refute summary judgment; rather, her response brief implies that she is proceeding under the direct method of proof. [ECF No. 61, pp. 14–18.] The question before the Court, then, is whether the evidence as a whole would permit a reasonable factfinder to conclude that Hope was denied "the opportunity for training and advancement" as she alleges in her Complaint because of her race, sex, and/or age. Such evidence may include:

> (1) Suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

*Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014)). Hope argues that she has presented evidence from all three categories above; thus, the Court will address each in turn, noting, however, that much of the evidence overlaps.

1. *Ambiguous Statements and Suspicious Timing*

According to Hope, King's statements following her removal from Aux 1 training were ambiguous and contradictory. She claims that he initially told her she was removed because her crew had reported she was causing production losses, but then—when confronted as a part of a group including Hope's crew members—he "admitted" that the reason production was low was because AM had taken away the crew's inventive pay. The Court agrees with AM that a close reading of the testimony establishes that King's statements were neither ambiguous nor contradictory. King testified that he removed Hope from Aux 1 training because she was unable to perform several of its required tasks; he also indicated that other employees told him they believed Hope was responsible for the drop in production. Hope testified that after King provided her with the aforementioned rationale, she along with her other crew members informed King that the drop was actually due to the incentive pay issue.[20] Even assuming Hope's version of events is accurate, her testimony does not establish that King "admitted" anything; it simply shows that King was subsequently made aware of another possible reason for the productions issues. This does little to advance Hope's theory that the removal was because of her

---

[20] Hope also points to her own testimony that her younger, Caucasian male crew members did not want her to qualify at Aux 1 because her next training job would be that of Assistant Roller. Even if this evidence was not speculative, it is unclear why Hope believes it is material to King's decision to remove her from Aux 1, as she does not provide evidence that King was aware of these alleged desires prior to making his removal decision.

race, sex, or age—especially in light of the Tandem Mill's undisputed production metrics improvement post-Hope's disqualification, despite the employees' incentive payments not being reinstituted. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("explanations must *actually be* shifting and inconsistent" to be considered evidence of discrimination) (emphasis added).

Hope claims that the fact that King "qualified" her for the Aux 2 assignment shows she demonstrated "proficiency" at the position, leading to the inference that her disqualification by Velto from the Auxiliary altogether was suspicious. However, while King did move her from Aux 2 to Aux 1—thereby technically making her qualified at Aux 2 due to the line of progression—he specifically testified that he did so in order to help her learn the Aux 2 job because she did not seem to be progressing the way he had wanted her to; according to King, he personally did not break the two assignments down in his mind as an employee needed to know both Auxiliary positions in order to be qualified. Thus, King's initial Aux 2 qualification does not corroborate Hope's assertion that Velto's latter disqualification was discriminatory.

Hope's most significant piece of evidence related to ambiguous statements is her allegation that on June 19, 2012, Velto told her he wanted the "younger mens" on the mill in the wake of her Aux 2 disqualification. Velto insists that he referred to "younger guys" in that conversation to mean people with less seniority than Hope, and Harris—who was present at the meeting as a member of the Union Grievance Committee on Hope's behalf—attests to this phrasing and understanding as well. However, for purposes of the instant motion, it must be assumed that Hope's recollection of the statement as "younger mens" is correct. While a stray remark is generally insufficient to establish discriminatory intent, an exception may apply where it was "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference

to the adverse employment action." *Egonmwan*, 602 F.3d at 850 (citing *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), *overruled on other grounds by Ortiz*, 834 F.3d at 760).[21] At first glance, Velto's remark certainly seems to fit the *Hemsworth* exception. Nevertheless, the Seventh Circuit has cautioned that such statements must be viewed in the proper context to determine whether they are sufficient to defeat summary judgment. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 720–22 (7th Cir. 2018). Here, it is undisputed that: (1) the conversation took place within the framework of a unionized work environment; (2) that it involved training and opportunities related to a specific line of progression wherein persons with the most seniority—meaning years of service at the mill as opposed to age—were given the next opportunity to train for new assignments; (3) that any employee who was unable to perform the essential functions of an assignment could be disqualified from it; and (4) that all of the employees on the Tandem Mill with less seniority than Hope were male at that particular time.

In light of the above, Velto's reference to wanting to give the "younger mens" a chance to train—after he determined that Hope was unable to properly perform the assignment's tasks—was not particularly probative of a gender-based discriminatory motive because *any* person next in the line of progression at that time who replaced Hope at Aux 2 would necessarily have been male. *See Newcomb v. Thorp Awnings, Inc.*, No. 1:03 CV 1814 SEB VSS, 2005 WL 1244979, at *10 (S.D. Ind. May 24, 2005) (statement that there were "guys in the back jumping at the bit to get your job" may have been perceived by the plaintiff as subjectively biased but was "more likely to be a comment about eager and competitive co-workers, all of whom happen to be male"

---

[21] Although Samuels attests he heard Velto state that he wanted "young males" on the mill, he did not provide any details related to timing and/or to whom the comment was made or was about. Without this information, it is not reasonable to infer that the comment is evidence of discrimination against Hope. *See Egonmwan*, 602 F.3d at 850 (noting that a gap of several months between ambiguous comments and an adverse employment decision was too long to create a reasonable inference of discrimination; same for remarks that did not specifically refer to the plaintiff's termination).

based on the specific work environment). Moreover, with regard to the men being "younger," even crediting Hope's interpretation of the word over Velto's contextually reasonable explanation of it being related to seniority, Hope's own testimony does not serve to support an inference of discrimination. When asked at her deposition to elaborate on the conversation, Hope repeatedly insisted that Velto referred to the men having "that zing," which Hope understood to mean "energy" or "muscles." However, neither energy nor muscles are directly attributable to age. *See Skiba*, 884 F.3d at 720–22 (hiring managers' beliefs that an alternate candidate would be "a little faster" and that that the plaintiff had "low energy" did not support a valid inference that their decisions were impermissibly based on age because the plaintiff's "proffered theory [was] too divorced from the factual record to create a genuine issue of material fact"); *see also Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 991 (7th Cir. 2016) (testimony that employee was fired because management wanted someone "younger and brighter" did not give rise to an inference of discrimination when it was explained that the employee thought it meant he wanted someone with "more education" or experience in the field). Thus, viewed in context, Velto's remark, by itself, does not necessarily support a finding of discriminatory motivation. *See, e.g.*, *Schuster*, 327 F.3d at 576 (age-related remarks viewed in the proper context were less likely to have been motivated by a discriminatory animus than by the particular "business climate" or the "realities of the marketplace"). That said, the Court has considered it as part of the whole picture when deciding whether a reasonable factfinder could conclude that Hope's sex and age caused AM to deny her the opportunity for training and advancement. What the Court has not done, however, is consider this comment as evidence pertinent to Hope's race discrimination claims, as nothing about this remark speaks to race.[22]

---

[22] Hope also asserts that Harris' decision to allow his friends to train in violation of the line of progression is evidence of Velto's desire to have younger men on the mill because the timing was suspiciously close

2. *Similarly Situated Comparators*

According to Hope's response brief, Harris arranged for five (5) less senior, younger, white males to "skip over the Aux 1 position and qualify directly from Labor Grade 2 positions to Labor Grade 5 positions—in violation of the line of progression" shortly after her EEOC Charge of Discrimination was resolved, which provides proof that AM treated these similarly situated comparators favorably. However, as noted in the facts section above, the materials cited by Hope do not support this contention. First, Hope testified that these employees were allowed to move from Aux 2 to Asst Roller training, so the alleged "skipping" pertained to the Aux 1 assignment which—like the Aux 2 assignment—is Labor Grade 3. According to the line of progression, the assignment directly following Aux 1 is the Asst Roller assignment which happens to be a Labor Grade 5 position. The characterization of Hope's testimony as establishing a jump from Labor Grade 2 to Labor Grade 5 is inaccurate. Additionally, the "rosters" Hope provided with her affidavits—to purportedly demonstrate that employees were promoted ahead of her—appear to indicate that the five (5) men referenced above were *qualified* at the Aux 1 assignment, not that they skipped over it.[23] Hope does not address this contradiction in her response brief or in the affidavit itself. More importantly, as noted by AM, even assuming that Harris arranged for these employees to move from Aux 2 straight to Asst Roller training, Hope testified that he did so because those men were his "buddies" who had voted for him and did *not* do it because of their sex, race, or age. Thus, at its core, Hope's argument with regard to this

_____

to her removal from the Auxiliary. This evidence overlaps with Hope's argument that those employees were treated more favorably than she was and will be addressed in the following section.

[23] The rosters list the various assignments at the top of the page and the employees' names down the side of the page. There are "Xs" marked in boxes seeming to correspond to each assignment the employees held. Some boxes are left blank and some are blacked out. The Aux 2 and Aux 1 boxes associated with Hope are blacked out. There are "Xs" in the Aux 2 and Aux 1 boxes for each of the five (5) employees referenced. [ECF No. 47-3, pp. 4–5; ECF No. 60-1, pp. 7–8.]

evidence is that Velto allowed Harris to make improper training decisions based on his personal relationships with other employees. While, if true, this may have been unwise or even unfair, based on Hope's own testimony it does not point to a discriminatory motive. *See David*, 846 F.3d at 229 ("Our role, however, is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose.") (quotation marks and citation omitted).

Hope also contends that AM promoted as many as ten (10) additional "younger white males" for positions ahead of her. However, the evidence Hope relies on—namely her own affidavit that references the employee "rosters" mentioned above—does not establish that these co-workers were treated favorably. It simply shows the various positions that were available to train on including the Aux 2, Aux 1, Asst Roller, and Roller assignments and which employees had qualified at each. The rosters do not indicate that any of the employees who allegedly qualified ahead of Hope had failed to become proficient at an assignment yet moved up anyway. In fact, the rosters appear to identify other employees with boxes blacked out for certain assignments—like Hope—that also did not progress beyond the assignment for which they had failed to qualify for and/or had been removed from.[24] This is exactly type of evidence that the Seventh Circuit has dismissed as unavailing. *Skiba*, 884 F.3d at 723 (noting that the plaintiff's table listing the names, ages, and positions of thirty-seven younger employees provided "no amplifying detail of the employees' qualifications or employment history that would allow this

---

[24] The box related to the Feeder assignment is blacked out in Riffle's row. [ECF No. 47-3, p. 4.] This is in line with the evidence submitted by AM and not disputed by Hope—Riffle, a non-African-American male, was disqualified from the Feeder assignment. Additionally, while Hope's supplemental affidavit states that Brian Holst (Holst), a Caucasian male of unknown age, achieved the highest assignment of Aux 2 training, the box related to Aux 2 is blacked out in Holst's row on the most recent "roster." [ECF No. 60-1, pp. 2, 8.] Hope does not address the discrepancy.

Court to comfortably conclude their hiring was the result of discriminatory motive rather than some other explanatory variable").

Moreover, in that same vein, while the Seventh Circuit has stressed that the similarly situated comparator analysis is a "flexible inquiry with no magic formula," *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018), it is clear that an employee with a different performance history and disciplinary record is not considered similarly situated. *See Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) (citing *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008)); *see also Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("In the usual case, a plaintiff must at least show that the comparators . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks and citation omitted). Here, AM has presented undisputed evidence that production metrics suffered when Hope was at the Auxiliary assignments from April 12, 2012, through June 20, 2012, and improved again when Hope was disqualified from Aux 2. Although it is true that not all negative production numbers can be directly attributed to Hope, Velto testified that a significant portion of the increase in gap time during that period was directly attributable to her. Hope has not presented evidence sufficient to dispute this fact.[25] Additionally, both King and Velto testified that they personally observed Hope struggle with the tasks of the Auxiliary assignments. Specifically, King testified that Hope had been involved in several personnel "incidents" and was unable to level the mill, properly inspect the top side of the strip for defects, or consistently make the strip

---

[25] In her response brief, Hope argues that AM "uses the same figures to argue that it was justified in disqualifying Hope from the Aux 2 position as it doe (sic) in arguing that it was justified in disqualifying her from the Feeder position." [ECF No. 61, p. 16.] This assertion is incorrect. As set forth in the facts section above, AM relied on different sets of data for the period when Hope was at the Auxiliary assignments than it did from the period when Hope was at the Feeder assignment. [*See* ECF No. 57-11, pp. 5–6; ECF No. 57-21.]

shape as flat as possible. Velto testified that he observed Hope and found that she was very unsure of how to improve the shape or steer the strip, that she was not open to constructive criticism and responded with profanity, and that he witnessed her deficiencies negatively affect productivity. Hope does not dispute the characterization of her attitude towards criticism, and she acknowledged that she was observed doing tasks incorrectly. While she placed the blame on a lack of proper training by Harmon, Aster, and Harris, Hope admitted that she received "extra training" on the Aux 2 and Aux 1 assignments and, importantly, did *not* testify that Crosslin—an additional hourly trainer assigned to her by King after he recognized that she was having difficulties mastering the tasks of the Auxiliary assignments—trained her improperly.[26]

Despite this evidence, Hope argues that Harmon, Richa, Samuels, and Silhavy were similarly situated and treated more favorably because they were working on the Aux 1 assignment when hundreds of tons of steel were rejected, but none of them were disqualified from their positions. However, the partially obscured, undated, unsigned document she cites does not indicate that these employees were responsible for the rejection of the steel, that they had caused the damaged tail that was the common source of the issue, that they specifically demonstrated any particular performance problems, or that they responded inappropriately to the feedback that was given. In fact, the portion of the document that starts to address the associated "reject cost" and probable solution is blocked out by what appears to be a wrinkled piece of paper, so it is impossible to tell what the document's intended purpose or result was other than to list the Aux 1 employees working at the unspecified time the steel was rejected. The handwritten notations—presumably added by Hope—do not properly serve to clarify the matter. Hope also

---

[26] Hope asserts that another African American employee, Samuels, was not provided with adequate training either. The Court will analyze the overarching problems with this line of evidence in the pretext section, as that is where it is addressed in Hope's response brief.

asserts that "other employees" in the Auxiliary assignments caused delays and damage but were not disciplined in the same manner that she was. However, the "turn operation reports" Hope points to in support of this contention do not name any of the individuals she alleges are "similarly situated," nor do they even mention the Auxiliary or Feeder assignments at all. They do not identify the decision-maker in charge of the unidentified employees at the time of the alleged damage and delays or address if any subsequent remedial action was taken.[27] As a whole, Hope's cited evidence is lacking in pertinent details that would permit the Court to engage in a "meaningful comparison in order to divine whether intentional discrimination was at play." *Skiba*, 884 F.3d at 723 (quoting *Coleman*, 667 F.3d at 847). Simply put, Hope has identified no other employee with a history of similar performance issues—who was afforded the opportunity for additional training—who was treated favorably. Because she failed to meet her burden of establishing that the individuals she listed were similarly situated, Hope's comparator argument is unavailing. *See id*. at 723–24 (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (holding that "we cannot compare [an employer's] treatment of [a plaintiff] and [a co-worker]" if the plaintiff "fail[s] to meet her burden of establishing that [the co-worker] is a similarly situated employee.")); *see also Abrego*, 907 F.3d at 1013–14 (the plaintiff referenced a fellow employee who was "not disciplined for yelling at a co-worker," but the court ultimately concluded he had failed to show any similarly situated comparator because there was insufficient evidence that any individual had a comparable set of failings including an inability to follow instructions and/or a pattern of misbehavior).

---

[27] Additionally, Hope argues that Velto provided contradictory reasons for disqualifying her from the Feeder assignment; however, because this evidence overlaps with pretext, it is more appropriately addressed in that context.

3.   *Pretext*

Hope argues that she has shown evidence of pretext related to her disqualifications and

removal. She states, in full:

> Defendant's contradictory statements as to why it removed Hope from training for
> Aux 1, why it disqualified her from the Aux 2 position, and why it then also
> removed her from the [F]eeder position is evidence of pretext. Samuel Berris
> identifies bias amongst line workers, who would not help him, an African-
> American, avoid mill wrecks, as they did not want to be perceived as helping an
> African-American employee advance ahead of Caucasians. Both he and Hope
> received inadequate training from Caucasian trainers. Here, in conjunction with
> ambiguous statements, and the presence of comparators, as addressed above, a
> reasonable fact finder could find Defendant's reasons for taking these actions as
> unworthy of belief, indicating that it sought to obscure the real reason—
> discrimination against an older, African-American and female employee.

[ECF. No. 61, pp. 16–17.] AM contends that Hope's pretext argument is conclusory and her

evidence is insufficient. In general, to show pretext, a plaintiff must identify sufficient

"weaknesses, implausibilities, inconsistencies, or contradictions" in the defendant's proffered

reasons so that a reasonable person could find them "unworthy of credence." *Skiba*, 884 F.3d at

724 (citing *Coleman*, 667 F.3d at 852). Evidence must be presented to suggest that the employer

is "dissembling," and the focus is on whether the employer honestly believed the reasons it gave

for the adverse action, not whether those reasons were unfair or inaccurate. *Id*. (citing *O'Leary v.

Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). Hope does not specifically identify

the "contradictory statements" that allegedly show pretext. To the extent she is referring to the

statements made by King related to her removal from Aux 1 training, the Court has addressed

that argument above in detail. In essence, Hope has not shown that King "admitted" to changing

his reasoning as she claims, nor is Hope's evidence sufficient to permit an inference that King's

original rationale was unworthy of credence even if additional explanations were later tendered

by Hope and her fellow employees.[28] As to Hope's contention that Velto "contradicted his own document" when he testified that he disqualified her from Feeder because she had caused two mill wrecks, the Court finds this argument unavailing based on the evidence submitted. Even assuming the "Spalled Rolls at the Tandem Mill" document had been properly authenticated, it does not contradict Velto's given rationale. While it states that some of the other mill wrecks had been caused by overpickled coils, the dates do not coincide with the wrecks—captured on video—that Velto testified Hope caused by improperly feeding the coils under the camera of the machine. The fact that different wrecks on different dates may have been caused by overpickled coils does not, without more, suggest pretext. *See, e.g.*, *Schuster*, 327 F.3d at 577 ("Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity.") (citations, including internal citation, omitted).

Finally, Hope argues that she has presented evidence of "bias amongst line workers" from whom she alleges she and other African-American employees were improperly trained. Hope points to Samuels, who attests that his unnamed Caucasian trainer did not properly train him or help avoid mill wrecks. However, even if true, Hope has provided insufficient evidence that Samuels' training issues were linked to his race.[29] Moreover, as noted by the Seventh Circuit, "[a]n inference of pretext may be permissible only when *decisionmakers* make false or

---

[28] The Court cannot discern any allegedly "contradictory" statements from Velto related to her disqualification from the Aux 2 assignment. To the extent that Hope is referring to his comment that he disqualified her because he wanted to give the "younger mens" or "younger guys" next in line a chance to train, Velto *admitted* saying some version of that phrase and testified as to its supposed meaning. The Court has addressed the impact of that statement above. However, to describe it as contradictory or pretextual misses the mark.

[29] As noted in footnote thirteen, Samuels' belief as to what motivated Caucasian Feeders is speculative, and what an unnamed Caucasian Roller allegedly told him is inadmissible hearsay. *See Bordelon*, 811 F.3d at 989.

inconsistent statements about the circumstances of a particular employment decision." *See Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876–77 (7th Cir. 2002) (emphasis in original). Here, the actions of Hope's non-decisionmaker trainers—specifically Harmon, Aster, and Harris whom she testified trained her improperly—are not demonstrative of pretext by King or Velto, especially in light of the undisputed fact that King assigned an additional hourly employee, Crosslin, to help train Hope after he noticed her having issues. *See id.* at 877 (citing *Jardien v. Winston Network, Inc.,* 888 F.2d 1151, 1154 (7th Cir. 1989) (holding that "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination")).

In sum, the evidence taken as a whole is insufficient to allow a reasonable factfinder to conclude that Hope's race, sex, and/or age motivated her removal or disqualifications. *See Ortiz*, 834 F.3d at 765. AM has presented unrebutted and/or insufficiently rebutted evidence that those employment decisions were made because, despite receiving extra training, Hope displayed performance problems and that production suffered—particularly as related to gap times—while she was at the Auxiliary assignments, that two mill wrecks occurred within a short period of time while she was at the Feeder assignment, and that her production statistics as Feeder compared unfavorably with those of other employees. While Velto's statement that he wanted to give the "younger mens" a chance to train on the Auxiliary following her disqualification from Aux 2 could be deemed evidence of age and/or gender-based animus if viewed by itself and out-of-context, when considering the record in its entirety, no reasonable factfinder could find that Hope's age, gender, and/or race were motivating factors for any of AM's employment decisions. *See, e.g.*, *Skiba*, 884 F.3d at 725–26 (holding that "[a]t the end of the day," the evidence presented did not permit a reasonable factfinder to infer that discrimination caused the adverse

actions); *Vasquez v. Caterpillar Logistics, Inc.*, 742 Fed. Appx. 141, 142–43 (7th Cir. 2018)

(absence of evidence of discrimination in the record was enough to affirm the district court's

entry of summary judgment, but the decision could also have been affirmed on the basis that the

defendant "supplied evidence that it fired [the plaintiff] for a legitimate reason—it believed that

[the plaintiff] was a poor performer—and [the plaintiff] has not furnished sufficient evidence

suggesting that [the defendant] did not believe its rationale"); *Heise v. Canon Solutions Am.,

Inc.*, No. 16 C 8284, 2018 WL 3533255, at *10 (N.D. Ill. Jul. 23, 2018) (a reasonable factfinder

could have inferred gender-based animus from some of the background evidence including

statements by decisionmakers that the plaintiff was a "silly girl" and that "[n]one of my guys act

the way you do," but no reasonable jury could have viewed the record in its entirety and

concluded that the defendant's explanation was pretextual or that her gender was the real reason

for her termination); *U.S. EEOC v. Cont'l Airlines, Inc.*, 04 C 3055, 2006 WL 14510, at *8 (N.D.

Ill. Jan. 3, 2006) ("[E]ven the cumulative effect of the evidence does not raise a question of fact

as to [the defendant's] discriminatory intent.").


## D. Retaliation

To establish unlawful retaliation, "a plaintiff must show that: (1) she engaged in protected

activity; (2) she suffered an adverse action; and (3) there was a causal connection between the

two." *See Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018)

(citing *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 668 (7th Cir. 2017) (elements

of a Title VII retaliation claim) and *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016)

(same for ADEA)); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (same

standards also apply to retaliation claims brought pursuant to § 1981). "An action is materially

adverse if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kuhn v. United Airlines, Inc.*, 640 Fed. Appx. 534, 538 (7th Cir. 2016) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted)). For claims brought pursuant to the ADEA, "retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011).

Hope argues that her disqualification from the Feeder assignment in December 2014—which became final in March 2015—was done in retaliation for her earlier complaints of discrimination including the internal Civil & Human Rights Complaint she submitted to the Union on November 1, 2012, the subsequently filed EEOC Charge of Discrimination that resulted in a Dismissal and Notice of Rights to sue letter dated September 27, 2013, and the instant lawsuit that was filed on December 30, 2013.[30] It is undisputed that her removal and disqualification from the Aux 1 and Aux 2 assignments pre-dated any of the aforementioned complaints, so they cannot serve as a basis for her retaliation claim. In her response brief, Hope again generally references suspicious timing, ambiguous statements or behavior towards those in a protected class, similarly situated comparators, and pretext; she states that "[t]hese are the same types of evidence which Hope put forth with regard to the discrimination claims above."

Specifically, Hope argues it was suspicious that soon after the EEOC investigation was deemed complete, Harris permitted five (5) white males to skip the normal line of progression and advance directly from Aux 2 to Asst Roller assignments. As an initial matter, the Court notes

---

[30] Hope's response brief identifies her disqualification from Feeder as the sole retaliatory adverse action at issue. [ECF No. 61, pp. 1, 19.] Thus, the Court is limited to this argument. *See Burton*, 851 F.3d at 695 (plaintiff has the burden of "identifying protected activities and materially adverse actions in opposition to summary judgment before the district court").

that temporal proximity alone is rarely sufficient to defeat a motion for summary judgment in retaliation cases. *See Abrego*, 907 F.3d at 1015. Moreover, as set forth in detail in the preceding sections, the evidence submitted by Hope—namely the employee rosters and her own affidavit—does not support the allegation of impermissible "skipping." And, even assuming that "skipping" occurred, Hope testified that the reason the men were allowed to advance was because they were "buddies" with Harris who had voted for him and were part of his "clique." She indicated that she believed she was not one of those who was allowed to skip over assignments because she refused to "suck up" to him and had hurt his pride. None of these reasons has anything to do with her complaining of discrimination by Velto; thus, it is not reasonable to infer that retaliation was connected to these alleged actions.

Hope also argues that her disqualification from the Feeder assignment was retaliatory because she had successfully held the position for many years. She states that "[t]his, along with the evidence set out above, is sufficient evidence for a reasonable jury to determine that [AM] retaliated against [her] for complaints of discrimination." However, Velto testified that she was removed from Feeder after video evidence surfaced revealing she had caused two dangerous mill wrecks within a short span of time.[31] Hope does not dispute that the wrecks occurred, although she only remembers one of them. Hope attempts to argue that this reason given by Velto was pretextual, but she has not provided sufficient evidence to create a genuine dispute. As noted above, the "Spalled Rolls at the Tandem Mill" document she relies on refers to different wrecks on different dates and is not demonstrative of pretext. In addition, Hope has not properly identified any similarly situated comparators who were treated more favorably, nor has she cited

---

[31] Velto also testified that the disqualification was allowed to stand because, despite additional training following the initial decision, Hope demonstrated deficiencies—both observable and documented through computerized data—in performance.

any ambiguous statements related to retaliation. In fact, as pointed out by AM, Hope testified that her disqualification from Feeder "seem[ed] like it just happened" and was *not* done in retaliation for her complaints of discrimination. Although her own attorney later attempted to rehabilitate this testimony, it was done in only a broad manner without reference to any particular details. In essence, Hope is left only with her own "bald assertion" to support her claim of retaliation. This is not enough to defeat summary judgment. *See Bordelon,* 811 F.3d at 991 (sweeping generalizations about the way members of a protected class were treated is not sufficient to preclude summary judgment).

Considering the aforementioned, it is not reasonable to conclude that Hope was retaliated against by AM. Even when all inferences are drawn in favor of Hope, she has failed to point to sufficient evidence that would allow a reasonable jury to conclude that her disqualification from Feeder was causally connected to her complaints of discrimination. *See Abrego*, 907 F.3d at 1015 (aside from suspicious timing, the plaintiff—who "was terminated for a plethora of legitimate reasons"—failed to point to "any other circumstantial evidence to allow a reasonable jury to conclude that but-for his filing of the EEO complaints, he would not have been suspended or removed"); *Heise*, 2018 WL 3533255, at *12 ("As was the case with respect to [the plaintiff's] discriminatory discharge claim, on this record, even when all reasonable inferences are drawn in favor of [the plaintiff], a reasonable jury simply could not find a causal connection between [the plaintiff's] discrimination and harassment complaints and her termination.").

**CONCLUSION**

For the reasons set forth above, the motion for summary judgment [ECF No. 56] is

**GRANTED**. Judgment will be entered in favor of the Defendant and against the Plaintiff.

Accordingly, the Clerk is **DIRECTED** to close this case.

SO ORDERED on February 4, 2019.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT